IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HUBERT G. SEXTON, JR. #321012, | ) | |
| DENNIS CARROLL #380026, | ) | |
| BILLY HOBBS # 232984, | ) | |
| JEFFREY BROOKS #443473, | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 3:22-cv-00489 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| CORE CIVIC INCORPORATED OF | ) | |
| TENNESSEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This is a pro se civil rights case under 42 U.S.C. § 1983 brought by four state prisoners at

Trousdale Turner Correctional Center (TTCC): Hubert Sexton, Jr., Dennis Carroll, Billy Hobbs,

and Jeffrey Brooks. Plaintiffs filed a Complaint (Doc. No. 1), applications to proceed as a pauper

(Doc. Nos. 4–7, 10, 12–13), and motions to appoint class counsel (Doc. No. 2), certify a class

(Doc. No. 3), and issue a preliminary injunction. (Doc. No. 11.) Plaintiff Sexton also filed two

motions of his own. (Doc. Nos. 14, 15.) Plaintiffs are suing Core Civic Incorporated of Tennessee

(CoreCivic), two CoreCivic executives, ten TTCC officials, and two Tennessee Department of

Correction (TDOC) contract monitors. This case is before the Court for initial review. For the

following reasons, the case will be referred to the Magistrate Judge for further development, and

Defendants that remain after this review must respond to the preliminary injunction motion.

## I. APPLICATIONS TO PROCEED AS A PAUPER

Inmates may bring a civil suit without prepaying the filing fee. 28 U.S.C. § 1915(a).

Prisoners who file a case together split the fees and costs for that case proportionally. (Doc. No. 9

at 1–2 (citing *In re Prison Litigation Reform Act*, 105 F.3d 1131, 1137–38 (6th Cir. 1997).) The total cost to file a civil case is $402, including a $350 filing fee and a $52 administrative fee, but the administrative fee is waived for persons granted pauper status. 28 U.S.C. § 1914. And so, in a case filed by four prisoners, each non-pauper prisoner is responsible for $100.50 ($402 divided by four), and each prisoner granted pauper status is responsible for $87.50 ($350 divided by four).

Each Plaintiff has now filed a signed application to proceed as a pauper with a certified trust account statement, as required by statute. *See* 28 U.S.C. § 1915(a)(2). These applications show that each Plaintiff cannot pay his share of the filing cost without undue hardship. (Doc. No. 4 at 3 (Plaintiff Sexton); Doc. No. 5 at 2, Doc. No. 12 (Plaintiff Carroll); Doc. No. 6 at 2, Doc. No. 10 (Plaintiff Hobbs); Doc. No. 7 at 2, Doc. No. 13 (Plaintiff Brooks).) Therefore, each Plaintiff will be granted pauper status and assessed $87.50 in the accompanying order. 28 U.S.C. § 1915(b).

## II. INITIAL REVIEW

The Court must review and dismiss the Complaint if it is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A; 42 U.S.C. § 1997e(c)(1). And because Plaintiffs are representing themselves, the Court must hold the Complaint to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

### A. Allegations

Plaintiffs allege that Defendants failed to protect them from beatings by gang-affiliated inmates, provide medical treatment following the beatings, and respond to subsequent sick-call requests, grievances, and letters. Plaintiffs allege that, due to severe staff shortages, a lack of staff training, and the failure to address known security issues, they live in fear for their lives, all while

continually failing to receive necessary medical treatment. (*See* Doc. No. 1 at 9.) They request monetary damages and a range of injunctive relief. (*Id.* at 10.) The Court will summarize the allegations specific to each Plaintiff before turning to allegations common to all four Plaintiffs, and in doing so, the Court accepts any factual allegations as true for the purpose of initial review.

1. Plaintiff Carroll

Under "shower security protocol," non-gang-affiliated inmates who do not allow gang-affiliated inmates to proceed to the shower are charged a fee, and if they cannot pay, they are beaten or stabbed. (*Id.* at 3.) Around 5:00 p.m. on April 9, 2022, Plaintiff Carroll frantically told Sergeant S. Cuebas that he feared for his life because gang members threatened to beat and stab him if he did not pay for breaking this protocol. (*Id.*) Plaintiff Carroll asked Cuebas to be placed on protective custody. (*Id.*) Cuebas disregarded this request and left the housing unit. (*Id.*) Plaintiff Carroll went to his cell, pressed the intercom button to request help, and found that the intercom was not functional. (*Id.*) Six gang members entered Plaintiff Carroll's cell, three carrying shanks. (*Id.*) Three of them punched and kicked Plaintiff Carroll in the face, neck, and back. (*Id.*) One kicked Plaintiff Carroll hard in the midsection, causing "excruciating pain." (*Id.*) As a result, Plaintiff Carroll suffered two black eyes, cuts on his lower lip, lower back pain, stomach pain, and severe headaches. (*Id.*) He also urinated blood for over two months. (*Id.*)

Plaintiff Carroll told Unit Manager Cherry Carter about this beating, requested to be placed in protective custody, and requested medical treatment. (*Id.*) Carter slammed Plaintiff Carroll's cell door with him inside, said "toughen up," and told him to fill out a sick-call request. (*Id.*)

2. Plaintiff Brooks

Around noon on April 16, 2022, four gang members entered Plaintiff Brooks' cell and punched and kicked him for breaking shower security protocol. (*Id.* at 4.) Plaintiff Brooks suffered

"excruciating chest pains, shortage of breath, mild headaches, [a] br[]uised jaw[,] and loose teeth." (*Id.*) Plaintiff Brooks told the gang members that he could not pay them $50 because he just had open heart surgery. (*Id.*) After the beating, the gang members went through Plaintiff Brooks' property and were upset when they could not find any commissary. (*Id.*)

Plaintiff Brooks told Unit Manager Carter about this beating, requested medical treatment, and requested to be placed in protective custody. (*Id.*) Carter disregarded these requests and refused to investigate the incident; instead, Carter took Plaintiff Brooks back to his housing pod and "made an announcement to all the prisoners not to mess with [Plaintiff Brooks]." (*Id.*)

### 3. Plaintiff Sexton

Around 4:00 p.m. on April 20, 2022, some gang members approached Plaintiff Sexton while he was watching T.V. in a common area and told him that he owed $50 for breaking shower security protocol. (*Id.*) Plaintiff Sexton attempted to report this issue to a TTCC staff member, but none were present. (*Id.*) Plaintiff Sexton went to his cell to press the intercom button and request help, but four gang members followed him inside the cell, started beating him, and threatened to stab him if he fought back (one gang member was holding a knife). (*Id.*) The gang members then kicked Plaintiff Sexton in the back and head. (*Id.* at 6.) As a result of this beating, Plaintiff Sexton suffered back pain, a head injury, several loose teeth, two black eyes, and cuts on his lips. (*Id.*) He now has double vision, and his eyesight is fading. (*Id.*)

On April 21, 2022, Plaintiff Sexton told Sergeant Cuebas about this incident and requested protective custody. (*Id.*) Cuebas disregarded the request and told him to "fight back." (*Id.*)

### 4. Plaintiff Hobbs

Around 7:00 p.m. on May 13, 2022, several gang members were chasing an inmate out of Plaintiff Hobbs' housing pod with knives. (*Id.*) There were 348 inmates in the housing unit at the

time, and the only official on staff in the unit was a single "on job training officer." (*Id.*) This officer "became afraid and went home," leaving the housing unit without any staff members. (*Id.*) At 10:30 p.m. that night, six gang members carrying knives entered Plaintiff Hobbs' cell to steal his commissary and clothes. (*Id.*) The gang members held a knife to Plaintiff Hobbs' throat while two of them punched Plaintiff Hobbs in the face. (*Id.*) Plaintiff Hobbs fell to the floor, and the gang members repeatedly kicked him in the face and head. (*Id.*) As the gang members were leaving the cell, one gave Plaintiff Hobbs a final kick on the left side of his rib cage, and Plaintiff Hobbs immediately began to cough up blood. (*Id.*)

Because there were no officers on staff in the housing unit on the night of the beating, and the intercom in Plaintiff Hobbs' cell did not work, he could not request medical treatment until shift change at 6:00 a.m. on May 14, 2022. (*Id.* at 7.) At that time, Plaintiff Hobbs told Sergeant Cuebas about the beating and requested medical treatment and protective custody. (*Id.*) Cuebas disregarded these requests and "slammed the door on [Plaintiff Hobbs]." (*Id.*)

5. Sick-Call Requests, Grievances, and Letters

After each Plaintiff was beaten by gang members, he submitted numerous sick-call requests. (*Id.* at 4 (Plaintiff Carroll submitted several sick-call requests between April 9 and May 10, 2022); *id.* (Plaintiff Brooks submitted sick-call requests on unspecified dates); *id.* at 6 (Plaintiff Sexton submitted numerous sick-call requests between April 20 and April 24, 2022); *id.* at 7 (Plaintiff Hobbs submitted numerous sick-call requests between May 14 and May 18, 2022).) No Plaintiff has received medical treatment, and Medical Service Administrator Holly Robertson did not respond to their requests. (*Id.* at 4, 6–7.)

Within two days of each beating, each Plaintiff filed a grievance regarding his respective incident. (*Id.* at 3 (Plaintiff Carroll filed on April 10, 2022); *id.* at 5 (Plaintiff Brooks filed on April

17, 2022); *id.* at 6 (Plaintiff Sexton filed on April 21, 2022); *id.* at 7 (Plaintiff Hobbs filed on May 16, 2022).) The applicable grievance policy required a response within seven days, but that did not happen. (*Id.* at 3, 5–7.) After this seven-day period, each Plaintiff filed a grievance against Grievance Chairperson Elizabeth Lopez for not responding to his original grievance by the deadline. (*Id.* at 3 (Plaintiff Carroll filed on April 18, 2022); *id.* at 5 (Plaintiff Brooks filed on April 24, 2022); *id.* at 6 (Plaintiff Sexton filed on unspecified date); *id.* at 7 (Plaintiff Hobbs filed on unspecified date).) To date, no Plaintiff has received a response to these grievances. (*Id.* at 4–7.) Plaintiffs maintain that Lopez has a history of mishandling inmate grievances. (*Id.*)

Each Plaintiff also wrote a letter to Internal Affairs Investigator Kelly Hunt about the beating he sustained, and she did not respond. (*Id.* at 4 (Plaintiff Carroll); *id.* at 5 (Plaintiff Brooks); *id.* at 6 (Plaintiff Sexton); *id.* at 7 (Plaintiff Hobbs).)

6. Allegations Against Supervisory Defendants

The Complaint includes additional allegations of liability for CoreCivic executives, TTCC officials, and TDOC contract monitors. To summarize, Plaintiffs allege that CoreCivic "enabled" their beatings through policies and customs "of under-staffing, inadequate medical care, failure to train and failure to act in preventing inmate-on-inmate assault." (*Id.* at 7.) Damon Hininger, CoreCivic CEO, gave rise to these policies and customs by "prioritizing shareholder profits over Plaintiff[s'] safety and security." (*Id.*) Steve Conroy, Vice President of Operations Administration for CoreCivic, is the "primary individual responsible for ensuring that Core Civic facilities" have an adequate number of properly trained staff members, and he failed in that duty at TTCC due, in part, to "calculated, profit-motivated understaffing decisions." (*Id.* at 8.)

Martin Frink, TTCC Warden, is responsible for overseeing TTCC staff. (*Id.*) Jacqueline Norman, Associate Warden of Quality and Treatment at TTCC, is responsible for treatment of

inmates and staff. (*Id.*) Terrell Williams and S. Beaver, the Chief and Assistant Chief of Security (respectively), are responsible for the safety and security of inmates and staff. (*Id.*) Donelle Harris, Chief of Unit Management, is responsible for ensuring Plaintiffs' safety. (*Id.*) Jon Walton and Christoper[1] Brun, paid by TDOC to monitor the contract between TDOC and CoreCivic, are responsible for observing and reporting on TTCC's compliance with the conditions of the contract. (*Id.* at 9.) All of these Defendants were aware of the "sever[e] staff shortage, the inmate-on-inmate assaults, the untrained staff, the staff failure to act due to their lack of training, the inadequate medical care and the intercom systems not working." (*Id.* at 8–9.) These Defendants failed to act to correct these issues. (*Id.*)

## B. Legal Standard

To determine whether the Complaint states a claim, the Court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court therefore accepts "all well-pleaded allegations in the complaint as true, [and] 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). An assumption of truth does not extend to allegations that consist of legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## C. Analysis

"There are two elements to a § 1983 claim. First, a plaintiff must allege that a defendant acted under color of state law. Second, a plaintiff must allege that the defendant's conduct deprived the plaintiff of rights secured under federal law." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d

---

[1] "Christoper" is the spelling provided by Plaintiffs in the Complaint. (*See* Doc. No. 1 at 1, 9.)

531, 539 (6th Cir. 2012) (citation omitted). Here, all Defendants are state actors for purposes of Section 1983, and Plaintiffs assert that Defendants (in both their individual and official capacities) violated Plaintiffs' Eighth Amendment[2] right to be free from deliberate indifference to their safety and health. (Doc. No. 1 at 2–3.) These claims have objective and subjective components. *Westmoreland v. Butler Cnty., Kentucky*, 29 F.4th 721, 726 (6th Cir. 2022) (citing *Richmond v. Huq*, 885 F.3d 928, 937–38 (6th Cir. 2018)). The Court will discuss the individual-capacity claims before turning to the official-capacity claims.[3]

    1. <u>Failure to Protect</u>

    "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994))). To state a claim for a violation of this duty, a plaintiff must show that, "'objectively,' he was 'incarcerated under conditions posing a substantial risk of serious harm.'" *Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) (quoting *Farmer*, 511 U.S. at 834). The plaintiff must also show that, subjectively, "the official acted with 'deliberate indifference' to inmate safety, meaning the official was 'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it.'" *Id.* (quoting *Farmer*, 511 U.S. at 829, 834, 847).

    Here, each Plaintiff satisfies the objective component by alleging that he was subject to a dangerous gang-enforced "shower security protocol," and risks to physical harm caused by severe

---

[2] Because Plaintiffs are convicted prisoners (rather than pretrial detainees), the Eighth Amendment (as incorporated in the Fourteenth Amendment so as to be applicable to states governments) is the source of their constitutional protections in this case. *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).

[3] "[A]n individual-capacity claim seeks to hold an official personally liable for the wrong alleged," *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citing *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013)), while an official-capacity claim (to the extent that it seeks damages as opposed to injunctive relief) "seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) (quoting *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993)).

understaffing and an inoperable intercom system, resulting in each Plaintiff sustaining a beating by gang-affiliated inmates. *See Farmer*, 511 U.S. at 843 (explaining that it does not necessarily "matter[] whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk"); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 815 (6th Cir. 1996) (discussing *Farmer*, 511 U.S. at 842–43) (explaining that a showing of "a 'pervasive risk of harm' . . . is consistent with *Farmer*'s requirement of a showing of a 'substantial risk of serious harm'"). The subjective component of this claim will be addressed with respect to each Plaintiff individually.

### A. Plaintiff Carroll

As an initial matter, Plaintiff Carroll plainly satisfies the subjective component of this claim against Sergeant Cuebas. Plaintiff Carroll alleges that before he suffered a severe beating by gang members on April 9, 2022, he frantically told Cuebas that he feared for his life because gang members in his housing pod threatened to beat and stab him if he did not pay for breaking shower security protocol. Plaintiff Carroll allegedly asked to be placed on protective custody, and Cuebas disregarded this request. Thus, Plaintiff Carroll has alleged that Cuebas knew of and disregarded the risk to safety before the beating occurred. That is sufficient to state a failure-to-protect claim.

Plaintiff Carroll also satisfies the subjective component against Unit Manager Carter. He alleges that, after the beating, he told Carter about it and asked to be placed in protective custody. Carter allegedly slammed Plaintiff Carroll's cell door and said, "toughen up." As the Supreme Court has explained, "a prisoner seeking 'a remedy for unsafe conditions'" is not required to "'await a tragic event [such as an] actua[l] assaul[t] before obtaining relief.'" *Farmer*, 511 U.S. at 845 (quoting *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993)). It follows that a prisoner who was already assaulted, allegedly like Plaintiff Carroll, does not have to wait for it to happen again

before seeking relief against an officer who is disregarding an ongoing risk of harm. *See Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 362–63 (6th Cir. 2013) (holding that inmate's failure-to-protect claim survived a Rule 12(b)(6) motion to dismiss against officers responsible for ensuring safety in the inmate's housing unit where the officers allegedly ignored a plea for help after a fight commenced in the inmate's cell). Here, it is reasonable to infer from the Complaint that Plaintiff Carroll continued to face a substantial risk of serious harm after the beating, that Carter knew of this risk when Plaintiff Carroll reported the beating, and that Carter disregarded this risk by ignoring Plaintiff Carroll's request to be placed on protective custody and taking no action to ensure his safety going forward. Accordingly, for the purpose of initial review, the Court will allow Plaintiff Carroll to proceed with a failure-to-protect claim against Carter also.

### B. Plaintiff Brooks

Plaintiff Brooks alleges that after four gang members assaulted him for breaking shower security protocol and sought to steal commissary items from his cell, he told Unit Manager Carter about it and requested to be placed in protective custody. Carter allegedly disregarded this request, escorted Plaintiff Brooks back to his housing pod, and announced "to all the prisoners not to mess with [Plaintiff Brooks]." As with Plaintiff Carroll, Plaintiff Brooks plausibly alleges that he continued to face an objectively serious risk of harm when Carter returned him to the housing pod. *See Farmer*, 511 U.S. at 845. And viewing the allegations in Plaintiff Brooks' favor, Carter's announcement—standing alone—could have been so ineffectual as to amount to conscious disregard of that risk. Even if Carter's alleged response is ultimately "shown to amount to no more than mere negligence," there are sufficient facts to "plausibly support the claim that [Carter was] deliberately indifferent to [Plaintiff Brooks'] need for protection" at this stage in the case. *See*

*Amick*, 521 F. App'x at 363. Accordingly, Plaintiff Brooks states a failure-to-protect claim against Unit Manager Carter.

### C. Plaintiff Sexton

Plaintiff Sexton alleges that, after gang members assaulted him for breaking shower security protocol, he told Sergeant Cuebas about it and requested to be placed in protective custody. Cuebas allegedly disregarded this request and told Plaintiff Sexton to "fight back." For much the same reasons that Plaintiffs Carroll and Brooks state failure-to-protect claims against Unit Manager Carter, Plaintiff Sexton states a such a claim against Cuebas. That is, viewing the allegations in Plaintiff Sexton's favor, he plausibly alleges that he continued to face an objectively serious risk of harm after the beating and that Cuebas' ineffectual comment amounted to a conscious disregard of Plaintiff Sexton's safety going forward.

### D. Plaintiff Hobbs

Plaintiff Hobbs alleges that, after gang members assaulted him while stealing his commissary and clothes, he told Sergeant Cuebas about it at the next available opportunity and requested protective custody. Cuebas allegedly responded by "slamm[ing] the door on [Plaintiff Hobbs]." Viewing the allegations in Plaintiff Hobbs' favor, that is sufficient to plausibly allege that he continued to face an objectively serious risk of harm after the beating and that Cuebas consciously disregarded that risk. Accordingly, Plaintiff Hobbs states a failure-to-protect claim against Cuebas.

### 2. Deliberate Indifference to Serious Medical Needs

Turning to Plaintiffs' physical condition following the assaults, the Court first notes that the Eighth Amendment is "violated when prison doctors or officials are deliberately indifferent to [a] prisoner's serious medical needs." *Richmond*, 885 F.3d at 937 (quoting *Comstock v. McCrary*,

273 F.3d 693, 702 (6th Cir. 2001)). The objective component of this claim "requires a plaintiff to show the existence of a 'sufficiently serious' medical need." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834). "The subjective component, in contrast, requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Id.* (quoting *Comstock*, 273 F.3d at 703).

Each Plaintiff satisfies the objective component, as the Court can readily infer that each Plaintiff had sufficiently serious medical needs after the beating he allegedly sustained from multiple gang-affiliated inmates. (*See* Doc. No. 1 at 3 (Plaintiff Carroll's allegations of black eyes, lower lip lacerations, lower back pain, stomach pain, severe headaches, and urinating blood); *id.* at 4 (Plaintiff Brooks' allegations of chest pain, shortness of breath, headaches, a bruised jaw, and loose teeth); *id.* at 6 (Plaintiff Sexton's allegations of back pain, a head injury, loose teeth, black eyes, lip lacerations, double vision, and fading eyesight); *id.* (Plaintiff Hobbs' allegations of coughing up blood after being kicked in the face, head, and ribs).)

Each Plaintiff also satisfies the subjective component of this claim against the prison official he allegedly told about the beating and asked for assistance, as the Court can plausibly infer a deliberate disregard to medical needs from that official's alleged failure to obtain medical assistance. For Plaintiffs Carroll and Brooks, that official is Unit Manager Carter. (*Id.* at 3–4.) And for Plaintiffs Sexton and Hobbs, it is Sergeant Cuebas. (*Id.* at 6–7.) Indeed, Plaintiffs allege that at the time they filed the Complaint,[4] they still had not received any medical treatment for their

_____

[4] That was about one month after the alleged assault of Plaintiff Hobbs, and two months after the alleged assault of Plaintiffs Carroll, Brooks, and Sexton. (Doc. No. 1 at 3–7 (alleging respective assault dates of May 16, April 9, April 16, and April 20, 2022); *id.* at 11 (Complaint dated June 14, 2022).)

injuries. Accordingly, Plaintiffs Carroll and Brooks state ongoing claims for deliberate indifference to serious medical needs against Carter, while Plaintiffs Sexton and Hobbs state such a claim against Cuebas.

### 3. Supervisory Liability

The Court also construes the Complaint to bring supervisory liability claims. (*See* Doc. No. 1 at 3 (asserting "failure to train").) "For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have 'encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (quoting *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008)). This standard requires a plaintiff to show, "'at a minimum,' . . . that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). One way to meet this standard is to show that a supervisor "abandon[ed] the specific duties of his [or her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Zakora v. Chrisman*, 44 F.4th 452, 475 (6th Cir. 2022) (quoting *Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018)).[5] "The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (citing *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)).

---

[5] This level of participation is a "likely example[] of the outer bounds of the 'active performance' necessary for a supervisory liability claim." *Winkler*, 893 F.3d at 899 (quoting *Essex*, 518 F. App'x at 355).

A. Non-Responsive Officials

As an initial matter, the Court notes that Plaintiffs bring this case against certain prison officials whose only involvement in this case is their alleged failure to respond to sick-call requests (Medical Service Administrator Robertson), grievances (Grievance Chairperson Lopez), or letters (Internal Affairs Investigator Hunt). But "[t]he 'denial of administrative grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." *See Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) (quoting *Shehee*, 199 F.3d at 300). Put only slightly differently, "[supervisory] liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee*, 199 F.3d at 300 (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998)). Similarly, "claims premised on the mishandling of [] grievances" are subject to dismissal because prisoners "have no constitutional right to an effective prison grievance procedure." *Hursey v. Anderson*, No. 16-1146, 2017 WL 3528206, at *2 (6th Cir. Mar. 31, 2017) (citation omitted). Accordingly, Plaintiffs fail to state a claim against Defendants Robertson, Lopez, and Hunt.

B. CoreCivic Executives

Next, Plaintiffs allege that CoreCivic CEO Damon Hininger caused their beatings by prioritizing shareholder profit over inmate safety. And they allege that Steve Conroy, CoreCivic's Vice President of Operations Administration, is the "primary individual responsible for ensuring that Core Civic facilities" have an adequate number of properly trained staff members, and he failed in that duty due to "calculated, profit-motivated understaffing decisions." But Plaintiffs allege neither that these Defendants directly participated in the specific incidents of deliberate indifference discussed above, nor that they had actual knowledge of a breakdown in the proper

working of TTCC. Accordingly, Plaintiffs' allegations are not sufficient to plausibly suggest liability for Hininger and Conroy based on a theory of supervisory liability.

### C. TDOC Contract Monitors

Plaintiffs also allege that TDOC Contract Monitors Jon Walton and Christoper Brun are responsible for observing and reporting on TTCC's compliance with TDOC's contract with CoreCivic. Plaintiffs allege (as they did not allege with respect to CoreCivic executives) that Walton and Brun knew about alleged conditions that plausibly reflect a breakdown in the proper working of TCCC—understaffing, untrained officers, and nonfunctioning intercom systems resulting in inmate-on-inmate assaults and inadequate medical care. (*See* Doc. No. 1 at 9.) But Plaintiffs do not allege that Walton and Brun are directly responsible for staffing or training at TTCC, such that the Complaint raises a plausible inference of a causal connection between the active performance of their job functions and the asserted constitutional violations. *See Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (rejecting supervisory liability claim where there was "no evidence that any execution of the supervisors' job function resulted in [the asserted] injury"). Accordingly, Plaintiffs fail to state a supervisory liability claim against Walton and Brun.

### D. TTCC Officials

Finally, Plaintiffs do state plausible supervisory liability claims against five TTCC officials—Warden Frink, Associate Warden Norman, Chief of Security Williams, Assistant Chief of Security Beaver, and Chief of Unit Management Harris. Plaintiffs allege that these officials both (1) knew about conditions plausibly reflecting a breakdown in the proper working of TCCC, and (2) were directly responsible for supervising and training staff and/or ensuring the health and safety of inmates. (*See* Doc. No. 1 at 8–9.) Plaintiffs' allegations in this regard are somewhat lacking details, but factual allegations need not be *detailed* as long as they plausibly suggest liability, *Iqbal*,

556 U.S. at 678, and Plaintiff's allegations permit a plausible inference that these officials knew of a heightened risk to inmates in Plaintiffs' circumstances and abdicated their specific job responsibilities by failing to take corrective action. *See Zakora v. Chrisman*, 44 F.4th 452, 477 (6th Cir. 2022) ("When supervisors responsible for inmate health and safety ignore known threats to those inmates, they are more than simply failing to act."). Drawing all reasonable inferences in Plaintiffs' favor, it is also plausible that this failure directly resulted in the asserted violations of Plaintiffs' rights to be free from inmate-on-inmate violence and deliberate indifference to serious medical needs. Accordingly, the Court will allow Plaintiffs to proceed with supervisory liability claims against these five TTCC officials.

### 4. CoreCivic and Official-Capacity Claims

Plaintiffs also bring this case against CoreCivic and all individual Defendants in their official capacities. (Doc. No. 1 at 2.) Official-capacity claims are equivalent to claims against the entity that a defendant represents. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)) ("[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent."). In this case, the CoreCivic executives and TTCC officials represent CoreCivic (because they are allegedly employed by CoreCivic), while the TDOC contract monitors represent TDOC (because they are allegedly employed by TDOC).

As a technical matter, because CoreCivic is named as a stand-alone Defendant, it is redundant to bring official-capacity claims against the individual Defendants representing CoreCivic. These redundant claims will be dismissed. *See J.H. v. Williamson Cnty., Tenn.*, 951 F.3d 709, 723 n.4 (6th Cir. 2020) (citing *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014)) ("The district court correctly dismissed these official capacity claims as superfluous of the

claim against the county."). So the question is whether Plaintiffs state any cognizable claim(s) against CoreCivic.

### A. CoreCivic

To state a claim against CoreCivic, Plaintiffs must allege that CoreCivic had a policy or custom that directly caused the asserted constitutional violations. *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)). Here, Plaintiffs attribute the asserted constitutional violations to CoreCivic policies or customs of understaffing, lack of employee training, and prioritizing profit over inmate safety and health. (*See* Doc. No. 1 at 7–8.) Although these allegations are not supported by much factual matter, the Court is constrained to construe the Complaint liberally and thus give Plaintiffs the benefit of the doubt at this stage in the proceedings. In doing so, the Court concludes that Plaintiffs have alleged sufficient facts to infer that CoreCivic has an unconstitutional custom of deliberately disregarding inmate safety. *See Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 604 (6th Cir. 2020) (noting, without opining on its viability, that the district court allowed a claim to proceed to trial against a county based on the county's alleged "longstanding failure to address [known safety concerns at a jail]"); *Wildbur v. Trousdale Cnty. Comm'r*, No. 3:21-cv-00212, 2021 WL 1405480, at *4 (M.D. Tenn. Apr. 14, 2021) (declining to dismiss prisoner's failure-to-protect claim against CoreCivic based on CoreCivic's alleged "utter lack of a response" to frequent and brazen gang activity). Accordingly, the Court will allow Plaintiffs to proceed with claims against CoreCivic for failing to protect them from harm by other inmates and being deliberately indifferent to their serious medical needs.

B. <u>TDOC</u>

Consistent with the discussion above, Plaintiffs' official-capacity claims against TDOC contract monitors Jon Walton and Christoper Brun are essentially claims against the TDOC itself. And the TDOC is an "agenc[y] of the state of Tennessee" that is "entitled to Eleventh Amendment immunity from suit for damages." *Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 454 (6th Cir. 2012) (citations omitted). Accordingly, Plaintiffs cannot recover monetary damages from Walton or Brun in their official capacities.

However, the Complaint also seeks several items of prospective injunctive relief.[6] Under the *Ex Parte Young* doctrine, a plaintiff may "bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017) (citing *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008)). This doctrine applies where a complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (internal citations and quotation marks omitted). There must be a "realistic possibility" that the state official being sued "will take legal or administrative actions against the plaintiff's interests." *Doe v. DeWine*, 910 F.3d 842, 848–49 (6th Cir. 2018) (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015)).

As discussed above, the Complaint plausibly alleges ongoing Eighth Amendment violations and requests prospective relief. And drawing all reasonable inferences in Plaintiffs' favor as it must, the Court concludes that the Complaint also plausibly alleges that the TDOC

---

[6] This includes: appointing an independent monitor to conduct unannounced inspections and evaluate the effectiveness of the grievance process, internal affairs department, and medical care at TTCC; installing a functional intercom system at TTCC; transferring Plaintiffs to a state-run facility not operated by CoreCivic; providing medical care to Plaintiffs; reforming the medical care system at TTCC; and properly training TTCC staff to handle inmate-on-inmate assaults. (Doc. No. 1 at 10.)

contract monitors may have the requisite enforcement authority to constitute proper Defendants under the *Ex Parte Young* framework. (*See* Doc. No. 1 at 9 (alleging that the contract monitors, in addition to observing and reporting on conditions at TTCC, "act as the TDOC Commissioner's designee").) Accordingly, the first of the two contract monitors listed in the complaint (Jon Walton) will remain as a Defendant in his official capacity only, so that a state official who may have authority to provide some or all of the requested prospective relief is a party to the case in the event that Plaintiffs prove entitled to it. The official-capacity claim against the other contract monitor (Christoper Brun), meanwhile, will be dismissed as redundant. *See J.H.*, 951 F.3d at 723 n.4.

### III. MOTIONS TO APPOINT COUNSEL AND CERTIFY A CLASS

Plaintiffs filed, with the Complaint, a motion to appoint class counsel and a motion to certify a class under Federal Rule of Civil Procedure 23. (Doc. Nos. 2, 3.) These motions are premature. Plaintiffs, as pro se prisoners, cannot represent the interests of other inmates. *See Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003) (citation omitted) ("Generally, pro se prisoners cannot adequately represent a class."). Therefore, the Court cannot certify a class based on Plaintiffs' pending motion. And because there is no basis to certify a class at this time, there is also no basis to appoint "class counsel" under Rule 23(g). *See* Fed. R. Civ. P. 23(g) ("Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.").

Nonetheless, Plaintiffs may still request the appointment of counsel to represent them (as opposed to representing a class as "class counsel" under Rule 23(g)). District courts have discretion to "request an attorney to represent any person unable to afford counsel," 28 U.S.C. § 1915(e)(1), with or without a motion being filed, although this request "is justified only by exceptional circumstances." *Richmond v. Settles*, 450 F. App'x 448, 452 (6th Cir. 2011) (quoting *Lavado v.*

*Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993)). For now, absent a motion to appoint counsel to represent Plaintiffs themselves, the Court declines to consider such an appointment. And if a licensed attorney enters an appearance on Plaintiffs' behalf in this case, either as a result of an appointment by the Court or some other means, then counsel may file a renewed motion for class certification. At this time, however, Plaintiffs' motions to appoint class counsel and certify a class (Doc. Nos. 2, 3) will be denied without prejudice.

## IV. MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs request preliminary injunctive relief in the form of immediate medical treatment and transfer to a state-run facility not operated by CoreCivic. (Doc. No. 11 at 8.) This motion alleges that Plaintiffs live in fear for their lives because TTCC's severe understaffing has resulted in TTCC officials relying on gangs to maintain order in the facility. (*See id.* at 1, 3, 5–6.) Plaintiffs also allege that they have suffered retaliation from TTCC staff members since filing this case (*see id.* at 7, 9), and that an unnamed staff member told gang members to "take out" (meaning kill) Plaintiff Sexton. (*Id.* at 7.)

Preliminary injunctive relief is "an extraordinary and drastic remedy," *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)), though it may be appropriate "to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends [he] was or will be harmed through the illegality alleged in the complaint." *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (quoting *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)). In deciding whether to grant a preliminary injunction, the Court considers: (1) whether the moving party has a strong likelihood of success on the merits; (2) the threat of irreparable injury to the moving party; (3) potential harm the injunction would

cause to third parties; and (4) the public interest. *Great Lakes Brewing Co.*, 860 F.3d at 849 (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).

Importantly, courts "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Therefore, the remaining Defendants in this case will be provided notice and an opportunity to respond to Plaintiffs' motion for preliminary injunctive relief.

## V. PLAINTIFF SEXTON'S MOTIONS

Finally, Plaintiff Sexton filed motions for an extension of time to complete Plaintiffs' in forma pauperis applications and ascertain status. (Doc. Nos. 14, 15.) Sexton is the only Plaintiff who signed these motions, however, and because Plaintiffs are representing themselves, every motion they submit to the Court must be signed by all four Plaintiffs. *See* Fed. R. Civ. P. 11(a). Moreover, as discussed above, each Plaintiff is being granted pauper status, so it is unnecessary to grant any extensions related to the in forma pauperis applications. Accordingly, Plaintiff Sexton's motions (Doc. Nos. 14, 15) will be denied as moot.

## VI. CONCLUSION

For these reasons, the Court concludes that Plaintiffs have stated Eighth Amendment claims for failure to protect and deliberate indifference to serious medical needs against the following Defendants: CoreCivic; Cuebas and Carter (in their individual capacities);[7] and Frink, Norman, Williams, Beaver, and Harris (in their individual capacities as supervisors). Plaintiffs may also proceed with their requests for injunctive relief from TDOC contract monitor Walton in his official capacity only. These matters will be referred to the Magistrate Judge for further proceedings. Except as just indicated, all claims and Defendants will be dismissed.

---

[7] Specifically, Plaintiff Carroll states a failure-to-protect claim against Cuebas and Carter, and a deliberate-indifference-to-serious-medical-needs claim against Carter; Plaintiff Brooks states both claims against Carter; Plaintiff Sexton states both claims against Cuebas; and Plaintiff Hobbs states both claims against Cuebas.

The remaining Defendants must respond to Plaintiffs' motion for a preliminary injunction. The Court leaves it to the Magistrate Judge's sound discretion to set an appropriate schedule for briefing and resolution of this motion.

An appropriate Order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE